Hoadly, Lauterbach & Johnson, for appellant.
James Henderson, for respondent.

---

·(16 Misc. Rep. 204.)

### In re BUCHAN'S WILL.

(Surrogate's Court, New York County. February, 1896.)

1. WILLS—TESTAMENTARY CAPACITY.
    Evidence that a testatrix, when she made her will, was suffering from Bright's disease, which at times rendered her irrational, and that she died from it next day; that the will, though it contained, contrary to her usual style of composition, lapses in words and sentences, clearly showed the disposition she desired to make of her property; that she gave the Christian name of her executor as Henry (a name by which he was frequently addressed by others), instead of Hosea, his proper name,—did not show mental incapacity, where it appeared that she asked for pen and paper, and after asking the date, without any prompting, wrote, dated, and signed the will, and then asked two persons to witness it, and directed them to give their residence.

2. WILLS—EXECUTION—EVIDENCE TO ESTABLISH.
    In proceedings for probate of a will, the first attesting witness (disqualified thereby as a devisee, who, though a short distance away, refused to appear as a witness) testified by deposition, taken by contestants, to whom she was friendly, that she did not see the testatrix sign it; that the signature was not shown by the testatrix to her to witness; and that the testatrix said it was a business letter, and asked her to sign, but not as witness. The hearing of this witness was slightly impaired. The second attesting witness (mother of three of the devisees) testified that the testator signed it in their presence, declared it to be her will, and asked them to sign as witnesses. *Held*, that a valid execution of the will was shown.

Proceedings by H. R. Drew, executor under the will of Mary A. Buchan, deceased, for probate of the will. The brother and the special guardian of a sister of the deceased opposed the probate. Probate decreed.

James Flynn (R. S. Ransom, of counsel), for proponent.
Adams & Hyde, for contestant.
R. L. Wensley, for special guardian.

FITZGERALD, S. The paper propounded as the will of the decedent is written on two sides of a half sheet of note paper. Line for line it is as follows:

To whom it may concern.
After my funeral expenses & are all paid I request & that Mr. Henry R. Drew shall have charge of my estate and also as I am guardian of my sister's estate. Who is of unsound mind, who is to administer the same as my best interest will permit, that one year after my death the $4,000 mortgage shall be paid off, and that two years after my death two thousand dollars shall be paid to each of following friends as follows, viz., To Het- tie Whaites, to Lu Thomas and to M. J. Thomas son of Mrs. Henrietta and also to Florence Renville daughter of the Willis J. Renville One thousand dollars, to be delivered without presidence, and also that treat her kindest shall board and support her at her own desire............................
October 6th, 1893.
Witness..Mary A. Buchan.
Florence M. Renville, Orange
Henrietta Thomas No. 10 W. 119 St.

It appears from the evidence that the paper was misdated. It was executed on November 6th, and not on October 6th. It was presented for probate by Mr. Drew, the party named therein to administer the estate. The decedent, Mary A. Buchan, was a single woman, of middle age. She died possessed of several houses and lots in this city, and real estate elsewhere, and some personal property. Her next of kin are a brother and sister, the latter conceded to be of unsound mind. The brother and the special guardian of the sister contest the validity of the instrument, alleging that it was not executed according to law, and that at the time of its execution she lacked testamentary capacity. The instrument was written in a legible hand, the day before her death, by the testatrix herself. The words at the beginning, "To whom it may concern," are not infrequently employed by laymen who assume to act as their own scriveners. It does not contain a declaratory clause that it is a will; nor is such a clause, though usual, necessary. Under the statute, the validity of the execution of the instrument depends on such a decla-

ration in words or in substance at the time of execution, but the nature of the instrument itself must be determined by its contents. Carle v. Underhill, 3 Bradf. (Sur.) 101. As is common in testamentary instruments, the paper provides for the payment of her funeral expenses. It names Mr. Drew (who had been her agent, and is a person of large business experience) to administer the estate, recites the fact that she is the guardian of her incompetent sister, and directs the payment of a mortgage and of four specific legacies to certain friends named. It was attested by the signatures of two witnesses. It is a written statement of her wishes in respect to the disposition of her estate after her death, signed and witnessed,— in brief, her will. This fact is made certain by the direction on the envelope in which she inclosed the paper to Mr. Drew, that it was to be opened after her death.

The facts which suggest testamentary incapacity are that Miss Buchan had for some time been suffering with Bright's disease of the kidneys, from which disease she died the day after she signed the paper; that some of the words are incomplete; that there are lapses in some of the sentences, and a manifest deterioration in composition, when compared with a postal card written a few weeks previously, doubtless caused by the malady that was soon to cause her death; and that she misstated the Christian name of Mr. Drew, it being Hosea, instead of Henry, which is explained by the fact that Mr. Drew signs his name "H. R. Drew," and it is not unusual for parties to address letters to him as Henry, supposing that to be his name. It is in evidence, also, that, at times during her protracted illness, she used childish and irrational language, and, further, that she asked Miss Renville to shoot her, and once she threatened to throw herself from the window. Had the paper been written and executed at a time when she was uttering these meaningless expressions or doing these irrational acts, it would be a just conclusion that her mind was too much impaired to execute a valid will. But it was not. At the time of executing it, she asked for pen and paper; and, when they were furnished, she, while sitting in bed, without any prompting, wrote the instrument, asked the day of the month, signed the paper, and not only requested Miss Renville and Mrs. Thomas to sign it, but to add their residences. The incongruities in the composition of the paper do not affect its dispository provisions in favor of the four special legatees, the benefiting of whom was the principal purpose of the instrument, for the great bulk of the estate, constituting the residue, will pass to the brother and sister, under the statutes of descent and distribution. Though Miss Renville gave it as her opinion that Miss Buchan was not of sound mind, Mrs. Thomas was equally confident that she was. The opinion of Dr. Eastgate, her attending physician in the country during the summer, and until after the month of September, was against her testamentary capacity; that of Dr. Pierson, of Orange, who visited her in this city on the 23d and 30th of October, in response to a request from Miss Buchan written the 22d, was that her mind was clear. The varying opinions even of the physicians are of slight, if any, importance in the light of the facts occurring

at the time of the execution of the paper, for it is evident that Miss Buchan's mind intelligently accompanied that act. The allegation that she was not of sound mind must be dismissed.

The remaining question to be considered is the validity of execution. The only testimony in respect to what occurred at the time is that of the subscribing witnesses, Miss Renville and Mrs. Thomas, each a cousin of Miss Buchan. Mrs. Thomas is the mother of three of the legatees, to each of whom is given a bequest of $2,-000, while to Miss Renville is given $1,000. On a very important point the subscribing witnesses do not agree. Mrs. Thomas testifies that Miss Buchan, after signing the paper in their presence, said: "This is my will. I would like you, Harriet and Florence, to come here and witness it." Miss Renville states that she did not see Miss Buchan sign it, nor did Miss Buchan show her signature to Mrs. Thomas, though Mrs. Thomas said she saw it when it was signed, and that Miss Buchan asked her (Miss Renville) to sign her name to the paper, but not as a witness; that Mrs. Thomas said, "Sissy [meaning Miss Buchan] wants you to sign this paper;" and that Miss Buchan spoke of it as a "business letter." If Mrs. Thomas is to be believed, there was an express declaration that the paper was her will; whereas Miss Renville says that the words "business letter," and not "will," were used. Which witness should be credited? In considering the question, the motive for misrepresentation should be examined. Mrs. Thomas, as the mother of three of the legatees, is interested in sustaining the will. This is also manifest by her earnest manner in giving testimony, as shown by the record. Miss Renville, though named as a legatee, is barred from receiving the bequest, because she is a subscribing witness. It is apparent from the objections filed, and from the evidence, that between Mrs. Thomas and the brother and those in sympathy with him there is not a cordial feeling; and it is quite apparent from the proofs that there is friendship between them and Miss Renville. She, though living in New Jersey, within an hour's ride of the city, declined to appear in open court for examination; and her testimony was taken under a commission on application of the special guardian, who contests the will. In an examination on a commission, counsel representing an adverse interest are generally at a disadvantage, as they have not the same opportunity of changing or discrediting statements of the witness which an examination before the court would afford them.

While the principles that should govern my decision in respect to the credibility of the witnesses are clear, their application is not so easy, because of the peculiar facts which have been disclosed by the evidence, and I prefer to give it a careful examination, in the light of the able briefs which have been presented by the respective counsel.

The statute in reference to wills was enacted to effectuate, not to defeat, the wishes of competent testators, who act without constraint in respect to the disposition of their estates. The formalities of execution prescribed are to make it certain that fraud, deception, or coercion are not practiced. When the circumstances

show that there is a testamentary purpose, the courts favor such an interpretation of the evidence that there may not be a miscarriage of justice.

The doctrine is concisely stated by Denio, J., in Hoysradt v. Kingman, 22 N. Y. 372, thus:

"The general right to dispose of one's property by act in writing to take effect at his death is established by our statute respecting wills, and has always been the law of this state. The restrictions which, from motives of prudence, are thrown around that right, should be construed liberally in favor of the testament, and forms should not be required which the legislature has not plainly prescribed."

In Jackson v. Christman, 4 Wend. 277, it is held that:

"If the subscribing witnesses all swear that the will was not duly executed, the devisee may, notwithstanding, go into circumstantial evidence to prove its due execution."

In Peebles v. Case, 2 Bradf. Sur. 226, it is laid down that:

"Even when the subscribing witnesses corruptly deny the execution, and, a fortiori, where they are mistaken, the proof of the will may be supplied from other sources. It is an error to suppose that the law has invested the subscribing witnesses with absolute power to defeat the ends of justice. It would be a most dangerous doctrine to hold that the validity of so important an instrument depends entirely on the honesty of two witnesses, and that, if they deny its execution, the will inevitably falls. Such may often be the consequence in the absence of any other proof, but it is not a necessary consequence in law. Such tremendous power is placed in no man. The proof of a will abides by the same rules of evidence as prevail in all other judicial investigations. The question for the court is the factum of the instrument, and that may be proved in the very teeth of the subscribing witnesses."

See, also, In re Cottrell, 95 N. Y. 329.

In Robinson v. Smith, 13 Abb. Prac. 359, there was a conflict in the testimony of the subscribing witnesses on the question of execution. The learned surrogate gave credit to that of the scrivener against that of the subscribing witnesses, who denied that there had been a valid execution of the will. On the whole of the evidence and the facts and circumstances disclosed, he was satisfied that the testator had signed the paper; that his name was visibly to it; and that the testator and the subscribing witnesses understood that it was a testamentary instrument. The opinion was so able and exhaustive that the general term did not discuss the case at length.

In Lewis v. Lewis, 11 N. Y. 220, it was held that the publication of a will may be inferred from the circumstances, as well as established by the direct and positive evidence of the witnesses.

In Lane v. Lane, 95 N. Y. 494, the court held that, from the situation of the parties and the circumstances surrounding them, the jury were justified in saying that the testator made the required declaration to the witnesses.

In re Beckett's Will, 103 N. Y. 167, 8 N. E. 506, was the case of an inferential publication. The paper was brief, and was inartistically drawn by the testatrix. At the time of its execution, she did not declare it to be a will, but spoke of it as a "paper." On a previous occasion, she had told the two witnesses that, at a future time,

she would want them to witness her will. On a subsequent day, she produced a paper, and stated to each that it was the one she had already spoken of, and she asked them to sign it. The court held that the previous characterization of the paper as a will applied to it, and identified it when it was produced for execution.

In a recent case (In re Hardenburgh's Will, 85 Hun, 580, 33 N. Y. Supp. 150) it is held that the failure of one witness to a codicil to remember what was said in regard to the same as fully as the other, who drew up the paper, did not disprove the facts testified thereto by such other witness; that the fact that the testator was fully apprised of the character of the instrument sought to be probated might be considered in aid of the proofs tending to establish publication; that any act of the testator in the presence of the witnesses at the time of the execution which tended to show that he desired to publish the same as a testamentary instrument, and that he wished the witnesses to execute it, might be considered; and although the testator did not, in words, declare it to be his last will, if he treated it as such, and intended the witnesses to understand it to be such, it was equivalent to such a declaration, and was sufficient to satisfy the requirements of the statute upon the subject, though the statute did not necessarily contemplate such a declaration in words in order to render the instrument valid as a will.

In Re Hunt's Will, 42 Hun, 434, a holographic will, the language is:

"It seemed very certain that the signature of the testator was in full view of the witnesses, and that the fair inference was that he signed it in presence of the witnesses; that, if the will was signed before its attestation by the witnesses, the exhibition of the will and of the testator's signature attached thereto, and his declaration to the witnesses that it was his last will and testament, and his request to the witnesses to attest the same, were a sufficient acknowledgment of the signature and publication of the will."

The decision was affirmed. 110 N. Y. 278, 18 N. E. 106.

The trend of the decisions in the English courts is also in the direction of a liberal construction of the law in respect to the execution of wills. Section 9 of the act of 1 Vict. is in words almost like our own.

In Ilott v. Genge, 3 Curt. Ecc. 160 (a holographic will), the question was the acknowledgment by the testator of his signature to the will at the time of its execution. In the decision this language is used:

"It is not necessary that the testator should state to the witnesses that it is his signature. The production of a will by the testator, it having the name upon it, would be a sufficient acknowledgment of his signature under the present statute."

In Gaze v. Gaze, 3 Curt. Ecc. 451, the note is:

"A testator produced a will all in his own handwriting, and having his name signed at the end thereof, to three persons, and requested them to put their names underneath his. Held a sufficient acknowledgment of his signature, the court being satisfied (though there was no express evidence of the fact) that the signature was of the handwriting of the testator."

The learned judge adds:

"I think it would be a hypercriticism to say that there has not been a sufficient compliance with the words of the act in this respect."

Blake v. Knight, 3 Curt. Ecc. 547, was also the case of a holographic will, and in the opinion it is held that:

"The court is not bound to have the positive affirmative evidence of the subscribing witnesses. I am quite satisfied that the name of the testator was signed to the paper before the witnesses subscribed; and I think that his acknowledging this to be his will, it being all in his own handwriting, and his name, as I hold, being then signed to it, amounts to a sufficient acknowledgment of his signature."

It is always embarrassing to determine where the truth lies when the statements of witnesses are at variance on an important point. Those of Miss Renville and Mrs. Thomas (both reputable women) can only be reconciled on the theory that Miss Renville (whose hearing is confessedly somewhat impaired) did not understand correctly what Miss Buchan said, that her memory was at fault, or that either she or Mrs. Thomas has been guilty of perjury, which last suggestion I cannot favor. It is well settled that an improper motive should not be imputed when witnesses give different versions of an event if the difference can be explained by defective memory or personal infirmity, and each witness is to be credited with a desire to tell the truth. It may be that during the transaction, in the presence of Miss Renville, Miss Buchan did use the word "business," coupled with the word "letter," in speaking of the paper; for she did inclose the will in an envelope, and addressed it to Mr. Drew. For her to have declared the paper to be a "business letter" would be inconsistent with all the circumstances surrounding the transaction. The paper was a will, and nothing else. It was written for a will, with an evident consciousness that she was nearing death. Miss Renville states that Miss Buchan signed it in presence of the witnesses, and not only asked them to attest it, but requested that they also write with their addresses. She put the paper in an envelope, which she herself sealed and addressed to the person whom she had named to carry out its provisions, with a direction in writing that it be opened after her death. Would she have done all these things in respect to a mere business letter? Miss Renville must have understood from what had occurred, and from the surrounding circumstances, that the paper was a will. The statement of the transaction given by Mrs. Thomas is in harmony with everything that occurred; that of Miss Renville is inconsistent with the probabilities.

I am mindful that Mrs. Buchan, the wife of the contestant, Mrs. Morgan, her mother, and Mr. Adams, one of the contestant's attorneys of record, have testified that subsequently Mrs. Thomas, in referring to the matter, said that the paper she signed was stated to be a "business letter"; and because of this it is sought to discredit her testimony. If Mrs. Thomas made such statement, it was an erroneous one. It is inconsistent with her testimony, which I believe to be trustworthy as to the declarations of Miss Br... in respect to the character of the paper, and with the probabilities of the case in view of the nature of the instrument itself and the circumstances attending its execution.

Probate decree.